# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**CURTIS A. JOHNSON, III**

**v.      No. 4-01-CV-00245 SMR**

**WAL-MART STORES, INC.**                                   **DEFENDANT**

## DEFENDANT'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

Plaintiff Curtis Johnson ("Plaintiff") filed his Complaint against Defendant Wal-Mart Stores, Inc. ("Wal-Mart") alleging that Wal-Mart discriminated against him based upon his race ("African-American") in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 as amended, and the Arkansas Civil Rights Act. Specifically, Plaintiff alleges Wal-Mart discriminated against him by demoting him from his position as a District Loss Prevention Supervisor ("DLPS").

Plaintiff was demoted in July, 2000, from a DPLS to an in-store Loss Prevention associate as a result of blatant and serious policy violations. As a DLPS it was Plaintiff's responsibility to provide loss prevention and security support to the stores in the district to which he was assigned.  Plaintiff was off his territory from June 30 until July 5, without updating his voice mail messages, leaving a contact for store management and loss prevention associates, or checking or responding to his voice mail messages. He did not request a day of vacation on July 3, 2000, nor did he notify his supervisor he was off his territory.  The events which occurred the Fourth of July weekend were a culmination of a several months decline in Plaintiff's performance, including other policy violations, failure to follow supervisors' directives, and failure to respond to the needs of

the stores for which he was responsible.  Plaintiff utilized Wal-Mart's Open-Door Policy[1] to appeal his demotion to the highest ranking Loss Prevention officer.  As a result, he was allowed to transfer to an assistant store manager position.

The undisputed facts and authorities cited in this brief established that Wal-Mart is entitled to a summary judgment dismissing Plaintiff's claim in its entirety.  As will be discussed in detail, Plaintiff cannot establish two of the four elements of his *prima facie* case—i.e, that he was meeting the legitimate expectations of his employer or that there were similarly situated Caucasians who were treated differently.  Further, he cannot prove that Wal-Mart's articulated legitimate business reason for his demotion is false, or that race was the real reason for his demotion.

## II.    FACTS[2]

Plaintiff Curtis Johnson was hired on January 7, 1995, as a loss prevention associate.  He was promoted to District Loss Prevention Supervisor on March 18, 1995, and assigned to supervise a Loss Prevention district in North Carolina.  He was later transferred to supervise a Loss Prevention district in Ohio.

In May 1998, Plaintiff transferred to the Loss Prevention district in northwest Arkansas which consisted of approximately ten stores in northwest Arkansas and southeast Oklahoma. He was pleased with this transfer because he wanted to come back to Arkansas where he grew up and went to college.

The Loss Prevention Division at Wal-Mart is responsible for ensuring the protection of the Company's assets.  A Loss Prevention district is generally co-extensive

---

[1] Wal-Mart's Open-Door Policy provides that any Wal-Mart associate may take any concerns, or appeal of an employment action, to a member of management either in his or her direct line of supervision or to any other manager in the Company.
[2] Citations to the exhibits supporting these facts are included in Defendant's Statement of Material Facts. The exhibits are attached to Defendant's Motion for Summary Judgment.

with an Operations district. The Loss Prevention Division serves as support to stores in the district. In-store loss prevention associates report dually to a District Loss Prevention Supervisor and to the store management where they are based. The store managers report to an Operations District Manager.

The primary duty of a DLPS is to provide support to the managers in the stores in the district. This includes auditing the financial aspects of the stores, training of associates, conducting investigations of associate policy violation and loss by customer and associate theft, and the responsibility for signage and camera surveillance. It is critical that a DLPS be accessible to the Operations District Manager and to store management in the various stores in the district at all times, or designate an available back-up person so that any issues involving integrity or loss can be addressed immediately. A DLPS reports to a Loss Prevention Regional Director. Glenda Fleming ("Fleming") became Plaintiff's supervisor in February 2000. Prior to that, Plaintiff's Regional Director from February 1999 to January 2000 was John (J.J.) Blevins ("Blevins").

Wal-Mart policy requires that Loss Prevention supervisors update their voice mail daily by 7:30 a.m., when changing store locations, and when leaving the store for the evening. The voice mail greeting should include how to contact the supervisor, and if the supervisor will be unavailable, how to contact the supervisor covering the area or the Home Office Loss Prevention. Policy also requires that the supervisor check the voice mail a minimum of three times a day. In the Loss Prevention Division, this is especially crucial because the stores must be able to contact the DLPS if an integrity issue or other situation arises.

When Fleming assumed responsibility for the region which included Plaintiff's district, she issued a memorandum to all of her direct reports informing them of her reporting procedures and expectations to which they would be held accountable:

> This memo outlines the reporting procedures and requirements that you will be held accountable for throughout the year. Many of the expectations are standards you have been following already and will not be a major change.
>
> Voice Mail / Itinerary
>
> Voice mail should be updated daily and include the following information: Store #, location, and store phone #. Supervisors should be in the store no later than 8:00 a.m. unless there is extensive travel involved. Any travel during the day from store to store should be updated on your voice mail with destination and anticipated arrival time noted. This is not only important information for myself to know but also for your stores and family in case of emergency situations.

In addition, Fleming addressed the vacation policy in this memo: "Please notify me in advance when you would like to take vacation time and who you have set up to cover your district while you are gone."

Loss Prevention managers are held to a high standard of compliance with company policy because of the nature of the job. Since they are charged with investigation and enforcement of policy violations by other associates, it is imperative that they adhere to the policies themselves.

On April 5, 2000, April 26, 2000, June 14, 2000, and again on June 16, 2000, Plaintiff failed to timely respond to voice mail messages from Ms. Fleming, who discussed this verbally with Plaintiff. Fleming had also warned Plaintiff that the consequences of not updating his voice mail would be a performance coaching issue.

On Monday morning, July 3, 2000, Ms. Fleming checked the voice mail of all the DLPS's who reported to her. The message on Plaintiff's voice mail still said it was

Friday, June 30.  She called the stores in Plaintiff's district but no one knew where Plaintiff was.  She left Plaintiff a message to call her.  Plaintiff picked up that message at 11:42 p.m. on July 3, 2000.  Ms. Fleming checked voice mail again at approximately 6:30 a.m. on Wednesday morning, July 5, 2000.  Plaintiff's message still said it was Friday, June 30th.  At around 11:00 a.m. on July 5, 2000, Plaintiff finally called Ms. Fleming.

Plaintiff had not requested a day of vacation for July 3, 2000.  Nor did he notify his supervisor, Ms. Fleming, any of his direct reports, the management in the stores for which he was responsible, or anyone else, that he would not be at work on July 3, 2000. Because his voice mail was not updated to reflect his location and he did not respond to messages left for him for a period of five days, no one knew how or where to contact him in the event that a serious situation required his immediate attention.

Plaintiff violated established policy, which had been reiterated in Fleming's memo of expectations, in taking off on July 3, 2000, without requesting a day of vacation or notifying his supervisor he would not be at work, in not keeping his voice mail updated, in not checking his voice mail, and in being out of contact with his supervisor and the stores for which he was responsible.

During the previous year, Plaintiff had been counseled by his supervisors about various performance problems, including:

- In November 1999, Regional Director J.J. Blevins verbally counseled Plaintiff for personal use of his company Visa card.  Plaintiff acknowledged that he understood the policy, yet he again used the card for personal use in November 1999

- On December 15, 1999, Blevins instructed Plaintiff and other DLPS's in the region that they could not transfer any in-store loss prevention associates without obtaining approval from him and notifying store management.  Plaintiff ignored this directive and transferred an in-store loss prevention associate to another store without receiving approval and without notifying the store management at either store.

- On January 13, 2000, Blevins issued a verbal coaching to Plaintiff for not paying his company credit card on time.[3]  The Visa card policy provides that any associate who appears on the 45-day late report will receive an automatic verbal counseling.

- On January 27, 2000, Plaintiff's supervisor, Blevins, gave Plaintiff a decision-making day[4] based upon the use of the company Visa card for personal charges in November after being previously counseled and because of his violation of the direct order not to transfer an associate.  Plaintiff was told that the next step would be termination.

- When Regional Director Fleming received the Visa report in February 2000, she discovered that Plaintiff had again violated the company Visa card policy by charging personal items in December 1999 and January 2000.  Although these charges had been made prior to the decision day counseling, Blevins was not aware at the time he issued the counseling

---

[3] Certain Wal-Mart managers, including DLPS's, are issued a corporate Visa credit card for business use only.  Personal use of the company credit card is a violation of Wal-Mart's policy.  Cardholders are reimbursed by Wal-Mart for expenses and are expected to timely pay the credit card bill.  Failure to pay the credit card bill by certain dates is also a violation which results in automatic counseling.  (Corporate Visa Card Policy, PD-49, Exhibit 6.)

[4] A decision-making day is the final step in Wal-Mart's corrective action procedure.  The associate is given a day off with pay and instructed to develop a plan of corrective action to address the issues for which the discipline was issued.

and Plaintiff did not disclose that he had continued to use the Visa card for personal charges.  Because Plaintiff had already received a decision day counseling, Fleming did not issue another formal disciplinary notice, but she did discuss this with Plaintiff on February 10, 2000.

During this same period, the store managers in Plaintiff's district expressed concerns that Plaintiff was not responding timely or appropriately to their loss prevention issues in their stores.  This had reached a level of such gravity in December 1999 that a group of store managers had an Open Door meeting with Blevins to address these issues.  The concerns raised by these managers included Plaintiff's failure to return voice mail messages, failure to follow up on investigations and other issues of concern to store management, failure to keep store management informed of relevant issues including activities and scheduling of the in-store associates.

Plaintiff's taking a day of vacation on July 3 without notifying his supervisor and his failure to update and check his voice mails and return calls were serious and flagrant violations which were grounds for disciplinary action, up to and including discharge.  In light of the previous performance problems and the fact that he had received a decision-making day, Plaintiff could have been discharged.  However, Fleming and Keith Aubele ("Aubele"), then Division Manager and Fleming's supervisor, recognized that Plaintiff had strengths and opportunities for advancement at Wal-Mart if he would resolve the communication issues and follow company policy.  Rather than discharging the Plaintiff, the decision was made to demote him.  Plaintiff was offered a position as an in-store loss prevention associate, the only position below district supervisor in the Loss Prevention Division.

Plaintiff used the Open Door policy to appeal the demotion decision by requesting a meeting with David Gorman ("Gorman"), Executive Vice-President, the top person in the Loss Prevention Division.   At Gorman's direction, Ramona Truax ("Truax"), Loss Prevention People Director, met with Plaintiff and investigated the decision.   She agreed with Plaintiff's supervisors that although Plaintiff had violated company policy which justified disciplinary action, that he had potential and would be an asset to Wal-Mart if he would adhere to company policy.   Truax recommended that Plaintiff be offered a transfer to Operations (Division I) as an assistant manager. Plaintiff's supervisors concurred that this would give Plaintiff an opportunity to resolve his problems and to continue his management career at Wal-Mart. Plaintiff was transferred to an open assistant manager position in Hot Springs, Arkansas.

## III.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   Once a motion for summary judgment points out the absence of proof regarding an essential element of the non-movant's case, the burden shifts to the non-movant to offer probative evidence that would permit a finding in his favor on more than mere speculation, conjecture or fantasy.   Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993).

A series of United States Supreme Court decisions "demonstrates that we should be somewhat more hospitable to summary judgments than in the past." City of Mount Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir. 1988). "The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." Id. The motion "need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenick v. County of Le Sueur, 47 F.3d 953, 959 (8th Cir. 1995) (citations omitted). In essence, the court must review the whole record, not merely the evidence most favorable to the non-moving party. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

## IV.    PLAINTIFF CANNOT ESTABLISH A CLAIM OF RACE DISCRIMINATION

In his Complaint, Plaintiff makes generalized across-the-board allegations dealing with various terms of employment without any factual specifics related to his employment at Wal-Mart. It is necessary to look to his EEOC Charge, filed on October 27, 2000, to determine that he is alleging that he was discriminatorily demoted. In this Charge, Plaintiff alleged:

> I was hired on January 7, 1995 as a District Manager for Loss Prevention. On May 10, 1998, I transferred from Ohio to Northwest, Arkansas. On July 6, 2000, I was demoted to an Assistant Manager by the Regional Director of Loss Prevention.
>
> I was told that I was demoted because I took a day off work without notifying my Supervisor and I did not update the voice mail.
>
> I believe that I was demoted because of my race, African American, in violation of Title VII of The Civil Rights Act of 1964, as amended.

See EEOC Charge, Exhibit 8.

Plaintiff cannot establish a claim of race discrimination as a result of his demotion.

Well-established rules allocate the burdens of production and persuasion to the parties in a race discrimination action. To recover for his claims of race discrimination under Title VII, the Plaintiff's evidence must be analyzed under the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506. (1993); United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 713-15 (1983); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981).

Courts also apply the McDonnell Douglas burden-shifting analysis to § 1981 and Arkansas Civil Rights Act claims. See Robinson v. Sears, Roebuck & Co., 111 F.Supp. 2d 1101, 1110 (2000); see also, Chock v. Northwestern Airlines, 189 F.3d 758, 761 (8th Cir. 1999) (Title VII and § 1981 are analyzed under the burden-shifting framework enunciated in McDonnell Douglas). Since the burden of proof requirements are identical, and the statute of limitations periods are virtually identical, Plaintiff's claims of discrimination asserted in all three causes of action will be considered together.

In order to establish a prima facie case of discrimination, Plaintiff must demonstrate that (1) he was a member of a protected class; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated employees who are not in the protected group were treated differently. Gilmore v. AT&T, 2003 U.S. App. LEXIS 3170, at *7-8 (8th Cir. 2003) (citing Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000)). If Plaintiff meets this burden, the

burden of production then shifts to Wal-Mart to articulate a legitimate non-discriminatory reason for its actions.

If Wal-Mart produces a legitimate non-discriminatory reason, then the burden shifts back to Plaintiff to show that the reason given by Wal-Mart was a pretext for the true reason – discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 515. Proof of pretext carries a heavier burden than what is required to meet the minimal showing of a prima facie case:

> An employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than it takes to make a prima facie case], however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification.

Sprenger v. Home Loan Bank Bd., 253 F.3d 1106, 1113-1114 (8th Cir. 2001).

Under the McDonnell Douglas framework, although the prima facie case shifts the burden of production to the defendant, the ultimate burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. St. Mary's Honor Ctr., 502 U.S. at 507 (citing Burdine).

A.   Plaintiff Cannot Establish a Prima Facie Case of Race Discrimination.

Plaintiff can meet two of the four elements of a prima facie case because he is in a protected group – African-American – and he suffered an adverse employment action when he was demoted. However, Plaintiff cannot meet the other two elements of the prima facie case.

1.   Plaintiff Was Not Meeting the Legitimate Expectations of His Employer at the Time of His Demotion.

No one questioned that Plaintiff had the ability to perform his job or that he did perform certain aspects of his job satisfactorily. However, ability is not enough to satisfy

the second element of his *prima facie* case.  The Eighth Circuit Court of Appeals directs that rather, a plaintiff must demonstrate that he or she "was actually performing [the] job at a level that met [the] employer's legitimate expectation."  Whitley v. Peer Review Systems, 221 F.3d 1053, 1055 (8th Cir. 2000) (citing Miller v. Citizens Security Group, Inc., 116 F.3d 343, 346 (8th Cir. 1997)).  The Eighth Circuit has applied this standard to the second element of the *prima facie* case on numerous occasions.  Id. (citing Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382-83 (8th Cir. 1994); Miner v. Bi-State Dev. Agency, 943 F.2d 912, 913 (8th Cir. 1991); Crimm v. Missouri Pac. R.R., 750 F.2d 703 (8th Cir. 1984); Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 290 (8th Cir. 1982), cert. denied, 459 U.S. 1205 (1983)).

During the months preceding his demotion in July 2000, Plaintiff was not performing at the level expected by his supervisors.  Plaintiff's problems were not simply those of poor performance.  He had repeatedly violated company policies and directives from his supervisors.  Loss Prevention supervisors are held to a high standard with regard to complying with Wal-Mart policies because they are charged with enforcing violation of the policies.  Plaintiff was not meeting this standard.

As a District Loss Prevention Supervisor, Plaintiff served as support to the managers and the in-store loss prevention associates in the stores in the district for which he was responsible.  One of the primary functions of the DLPS is to be available at all times, regardless of time of day, in case there is a loss prevention issue dealing with integrity or a major emergency.  The store managers must know how to contact their DLPS (or a designated alternate) at all times.  To accomplish this objective, Wal-Mart's Loss Prevention Voice Mail Policy requires that a DLPS update his or her voice

mail message every morning, anytime the DLPS changes store locations, and before leaving the store for the evening. The voice mail message should advise a caller where the DLPS can be located or, if unavailable, provide contact information for an alternate DLPS to call in case of an emergency. DLPS's are also required to check and respond to voice mail messages a minimum of three times daily. (Exh. 2, Depo. of Fleming, pp. 10, 30, 41, 54; Exh. 5, Voice Mail Policy.)

The communication issue was so important to Plaintiff's supervisor, Glenda Fleming, that, in addition to the general Loss Prevention policy on voice mail, she reiterated the requirements in a memorandum to all of her direct reports informing them of her reporting procedures and expectations to which they would be held accountable. These expectations included the importance of voice mail updates and payment of the Visa bill monthly as covered in the company policies. This memo informed supervisors that she expected them to be in their stores by 8:00 am. The memo also addressed the vacation policy: "Please notify me in advance when you would like to take vacation time and who you have set up to cover your district while you are gone." (Exh. 7, Region 42 Loss Prevention Reporting Procedures & Expectations.)

Between the fall of 1999 and his demotion in July 2000, a number of issues with regard to Plaintiff's performance arose. In November 1999, Plaintiff was informally coached for personal use of his Wal-Mart credit card, a violation of company policy. Despite acknowledging that he understood the policy, he again used the card for personal use in November, December and January. In January 2000, Plaintiff received an automatic verbal coaching for appearing on the 45-day late report because he did

not pay his company credit card bill on time. Plaintiff was told the next step would be a decision-making day.

In January 2000, in reviewing the credit card reports for his region, Plaintiff's supervisor, Regional Manager John J. Blevins, discovered that Plaintiff had again used the corporate Visa for his personal use in November despite being warned about this earlier in November. Blevins also discovered that Plaintiff had transferred an in-store associate to another store in direct contravention to Blevins' directive issued in December to all DLPS's. Not only had Plaintiff disregarded Blevins' directive, he had not informed the store managers at either store of the transfer. On January 27, 2000, Plaintiff was given a decision-making day counseling based upon the Visa card violations and his contravention of the direct order not to transfer an associate. Plaintiff was told that the next step was termination. (Exh. 9, Decision-day counseling.)

During this same period, the store managers in Plaintiff's district expressed concerns that Plaintiff was not responding timely or appropriately to their loss prevention issues in their stores. This had reached a level of such gravity and concern in December 1999 that a group of store managers requested an open door meeting with Blevins to address these issues. The concerns raised by these managers included Plaintiff's failure to return voice mail messages, failure to follow up on investigations and other issues of concern to store management, failure to keep store management informed of relevant issues including activities and scheduling of the in-store associates. (Exh. 11, Memo on Open Door Meeting.)

Plaintiff's supervisors and others in Loss Prevention were experiencing the same problems with regard to Plaintiff's timely execution of priorities and his failure to keep in

contact. On several occasions in April and June 2000, Plaintiff did not timely update his voice mail or check his messages and return calls as required by company policy. (Exh. 2, Depo. of Fleming, pp. 34-35.) Ms. Fleming discussed these issues with Plaintiff. (Exh. 1, Depo. of Plaintiff, p. 74.)

On Monday morning, July 3, 2000, when Ms. Fleming checked Plaintiff's voice mail, the message still said it was Friday, June 30th. She called his stores but no one knew where Plaintiff was. She left Plaintiff a voice mail message to call her which Plaintiff did not pick up until 11:42 p.m. on July 3, 2000. On July 5, 2000 at 6:30 a.m., Plaintiff's message still said it was Friday, June 30th. Plaintiff finally called Fleming at 11:00 a.m. on July 5, 2000. (Exh. 2, Depo. of Fleming, pp. 36-37.)

Plaintiff did not request to take a day of vacation on July 3, or notify Ms. Fleming that he was off his territory in Little Rock on Monday, July 3, 2000. Nor did he tell anyone at any of his stores that he would not be at work on July 3, 2000, or leave a name of someone in Loss Prevention to contact in his absence. Because his voice mail was not updated to reflect his location, and because he did not respond to messages left for him, no one knew where he was or how to contact him, or who to call in the event of a problem. (Exh. 3, Affidavit of Fleming.)

Plaintiff's actions on the weekend of July 4th were a serious breach of Wal-Mart's established policies. These actions, as well as his performance during the preceding months, demonstrated a clear failure to meet the legitimate and clearly communicated expectations of his supervisors. Accordingly, Plaintiff cannot meet the second element for establishing a *prima facie* case.

        2.    <u>Plaintiff Has No Evidence That Similarly Situated Caucasians Were Treated Differently</u>.

Plaintiff must demonstrate that there were individuals similarly situated in all respects who were treated differently. The Eighth Circuit Court of Appeals has addressed this final prong of the *prima facie* case in two recent cases.   A plaintiff has the burden of proving comparables were "similarly situated in all relevant respects" and the test for whether employees are "similarly situated to warrant a comparison to the plaintiff is 'rigorous.'"  Saulsberry v. St. Mary's University of Minnesota, 318 F.3d 862, 2003 U.S. App.Lexis 1657, at *12 (2003) (quoting Ricks v. Riverwood Int'l Corp, 38 F.3d 1016, 1019 (8th Cir. 1994) and Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994)).  The court in Gilmore v. AT&T, elaborates on this prong:

> Gilmore bears the burden to demonstrate by a preponderance of the evidence that there were individuals similarly situated in all respects to her who were treated differently.  The individuals used as comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."

2003 U.S.App.Lexis 3170 at *8 (quoting Clark v. Runyon, 218 F.3d at 918).

Plaintiff cannot meet this burden.  To withstand the rigorous scrutiny required by the Eighth Circuit, any comparables identified by Plaintiff must be similarly situated in all respects.  He has not and cannot do so.

As a result of the events of the July 4th weekend, Plaintiff was demoted to an in-store loss prevention associate.  After he utilized the Open Door policy to appeal this decision, he was ultimately placed in an assistant store manager position in Hot Springs, Arkansas.  Plaintiff was not singled out for demotion and treated differently than Caucasians.

16

Plaintiff contends that his former supervisor, J.J. Blevins, was not disciplined in a similar situation.  Plaintiff testified that when Blevins was called to the stage to receive an award at a Wal-Mart year-end meeting, no one could find him.  Plaintiff admitted that he did not know where Blevins was, but that "it was rumored that he was out running around with the fellows."  (Exh. 1, Depo. of Plaintiff, pp. 157-158.)

The situation with Blevins is in no way similar.   Wal-Mart holds mid-year meetings which are conducted in two identical back-to-back sessions at the same location with the same programs and presenters.   Blevins was a presenter at the meetings held in Dallas in 2000.   Presenters and others scheduled to be at both sessions are allowed to choose which of the two general sessions to attend. Although he was not aware of it, Blevins would be receiving the Sam W. Walton Award of Excellence at the 2000 mid-year meetings.  Blevins explained in his deposition why he was not in the audience when called to receive his award:

> Well, first of all, it was kept from me that I was receiving the award, and during that time in Dallas, there are two sessions that our Company holds meetings at mid year, and I was there to give presentations in both sessions.   And during one of the general sessions, on the first session, like, I think it was the second night, there was the time for them to give me the award and they was calling me out of the stands.   Now, during this time in Dallas, I had the autonomy to decide which sessions I went to and which ones I did not go to.   For example if I was going to be there for both, I could break up the sessions and go to this session, the first session, the second session.   And I went to part of that first session, the general session, and then left some of them to go the second session so they would not be redundant.

(Exh. 4, Depo. of Blevins, pp. 28.29.)

Blevins' situation in selecting which general session to attend is in no way comparable to Johnson's abandonment of his territory.  However, even if the situations

were the same, Blevins would not be considered a comparable to Plaintiff under the rigorous analysis required by the Eighth Circuit.

The fact remains that Plaintiff has identified no similarly-situated Caucasian DLPS who was off his or her territory without requesting a day of vacation or notifying the supervisor, or who failed to update his voice mail or check and return messages. There are no other DLPS's who engaged in the same misconduct which resulted in Plaintiff's demotion. There are certainly no other DLPS's who reported to the same supervisor as Plaintiff and who engaged in similar violations and were not demoted.

Plaintiff also has no evidence that, in general, Caucasian DLPS's in his district were treated more favorably than he. In response to whether Glenda Fleming treated Caucasian DLPS's differently, Plaintiff responded:

> Just only from perception. Perception is that folks that she was partial to had no problems with Glenda, but people that she did have problems with – that the perception was that the folks that she didn't like, she had problems with, it was major. It was a good difference between the two, you could definitely tell.

(Exh. 1, Depo. of Plaintiff, p. 82.)

Plaintiff then identified two Caucasian DLPS's whom he perceived Fleming treated differently. When asked how the two were treated differently, Plaintiff testified:

> Just the perception, to me, was that Stacey is a long-standing career of being around northwest Arkansas, his father was a Store Manager, his brother now is a Co-Manager, and Stacey has been with Wal-Mart ten years prior to and he has never left the hilltop area … [A]t that time frame, Stacey was like the golden boy to northwest Arkansas, and it just seemed like, from my perception, that their relationship was a pretty good one, based on that. Bill Hayes was a supervisor that worked the Tulsa, Oklahoma market, and it just seemed like she was partial to Bill, just based on perception.

(Exh. 1, Depo. of Plaintiff, pp. 82-83).

Plaintiff's "perception" that his supervisor was partial to two of his peers is not enough to establish the fourth element of his *prima facie* case, i.e., that others not in his protected class were treated more favorably.

      B.    <u>Wal-Mart Had a Legitimate, Non-Discriminatory Reason for Demoting Plaintiff.</u>

Assuming, *arguendo*, that Plaintiff could establish a *prima facie* case of race discrimination, the burden shifts to Wal-Mart to produce evidence that the adverse employment actions were taken for a "legitimate, non-discriminatory reason." <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. at 507. Regardless of whether Plaintiff met his initial burden, Wal-Mart can establish legitimate, nondiscriminatory reasons for demoting Plaintiff.

For the reasons discussed in connection with Plaintiff's failure to meet his employer's legitimate expectations, discussed at pages 12-16, *supra*, Wal-Mart had a legitimate reason for demoting Plaintiff. The series of events which occurred on the extended July 4th weekend were reflective of Plaintiff's cavalier attitude toward compliance with company policies and his failure to remain in close communication with the stores for which he was responsible. These serious breaches of Wal-Mart policy were the final events in a months-long decline in Plaintiff's performance. Although the next disciplinary step was termination, Plaintiff was instead demoted to an in-store loss prevention associate. Plaintiff used the Open Door procedure to appeal this demotion. In recognition of his potential if he would follow the company rules, Plaintiff was offered a transfer to an assistant manager position in the Operations Division.

Wal-Mart clearly had a legitimate reason for disciplining Plaintiff in the manner in which it did.  Wal-Mart has sufficiently met its burden of production and satisfied the second phase of the McDonnell-Douglas test.

> ### C.    The Reason for Plaintiff's Demotion was Neither False Nor a Pretext for Race Discrimination.

Once a defendant comes forward with sufficient proof to carry its burden of production, "the McDonnell-Douglas framework—with its presumptions and burdens—is no longer relevant."  St. Mary's Honor Center v. Hicks, 509 U.S. at 510.  "The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture."  Id. at 510-11 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 (1981)).  "[P]roof that the defendant's articulated explanation is false or incorrect does not, standing alone, entitle the plaintiff to judgment; instead, the showing must be that the explanation is a pretext for discrimination."  Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995) (citing St. Mary's Honor Ctr., 509 U.S. at 506-07).

A plaintiff may prevail only by proving both that the employer's reason is false and that discrimination is the real reason for the termination.  Krenik v. County of Le Seuer, 47 F.3d 953, 958 (8th Cir. 1995) (citing St. Mary's Honor Ctr. v. Hicks, 502 U.S. 502 (1993)).  Plaintiff can prove neither.

First, Plaintiff cannot show that the reason for his demotion was false.  He does not dispute that the chain of events which resulted in his demotion occurred.  Nor does he dispute that his conduct warranted disciplinary action. He merely believes that his actions were not "a valid enough reason" and "not grounds for me to be demoted." (Exh. 1, Depo. of Plaintiff, pp. 151, 157.)  Similarly, while Plaintiff disagrees with the

Visa policy which he violated, resulting in disciplinary action, he acknowledged "but nevertheless it is policy." (Exh. 1, Depo. of Plaintiff, p. 54). Significantly, Plaintiff was not aware of any disparate application of this policy between African-Americans and Caucasians. (Exh. 1, Depo. of Plaintiff, p. 55).

Second, even if Plaintiff were asserting that the reason articulated by Wal-Mart for demoting him was false, he could not establish that the real reason was his race. While Plaintiff may disagree with Wal-Mart's employment policies and its decision to demote him, that does not make the decision racially discriminatory or establish pretext. The Eighth Circuit Court of Appeals has recognized that "an employer may exercise business judgment in making personnel decisions." Walker v. AT&T, 995 F.2d 846, 849 (8th Cir. 1993). "(C)ourts have no business telling [employers] how to make personnel decisions, which may be objectively or subjectively based." Neufield v. Searle Laboratories, 884 F.2d 335, 340 (8th Cir. 1989). In McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507 (8th Cir. 1994), the court recognized that:

> [E]mployers have wide latitude to make business decisions. An employer has the right to assign work, to change an employee's duties, to refuse to assign a particular job and to discharge - for good reason, bad reason or no reason at all, absent intentional discrimination . . . . Furthermore, the Supreme Court has stated that the fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose the employer to Title VII liability. It is not sufficient for McLaughlin to raise an issue regarding whether it was a wise decision to transfer her. She meets her burden only if she can present evidence that would allow a reasonable jury to conclude that the decision was based on her gender.

Id. at 511-12.

"[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments

involve intentional discrimination." <u>Herrero v. St. Louis University Hosp.</u>, 109 F.3d 481, 485 (8th Cir. 1997) (quoting <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771, 781 (8th Cir. 1995)).

Mere suspicion or allegations that the asserted reason is a pretext and that the employer's true motivation was his race will not, without more, defeat summary judgment. *See* <u>Nelson v. Boatmen's Bancshares, Inc.</u>, 26 F.3d 796, 800 (8th Cir. 1994).

Plaintiff has no evidence that race discrimination was the real reason for his demotion. Although he contends that both of his immediate supervisors, Fleming and Blevins, discriminated against him with regard to discipline administered, he does not ascribe a racial motive for the discipline. Plaintiff admitted that Fleming had the same expectations of all DLPS's, her expectations did not violate policy, and there was no selective enforcement of her directives or Wal-Mart's policies. (Exh. 1, Depo. of Plaintiff, pp. 75-76.) Plaintiff has no knowledge that Fleming treats Caucasians differently than African-Americans with regard to application of the voice mail policy. (Exh. 1, Depo. of Plaintiff, p. 76.) While it was Plaintiff's "perception" that Fleming was partial to two Caucasian DLPS's in his region, he does not assign any racial reasons for this partiality. (*See* discussion at page 19, *supra*). Presumably, this partiality also worked to the disadvantage of the other Caucasians in the region. More importantly, there is no claim that these two DLPS's violated the policies that resulted in Plaintiff's demotion.

In discussing discrimination against him by Glenda Fleming, Plaintiff analogizes his situation to the situation of a Caucasian in-store associate, Bryce Coleman:

> <u>Well, his [Bryce Coleman's] situation shows a pattern of what I feel like is discriminatory actions based on Glenda Fleming.</u> Bryce called me one

morning, basically was in tears, and I'm like, "Bryce, what seems to be the problem? What's wrong," you know. And he basically told me that he had had enough, and basically was looking for other opportunities within the company. . . [Plaintiff goes on to describe a situation in which Fleming issued a decision day counseling to Coleman and then prevented him from obtaining a transfer.] I thought that was very, very dirty, I thought that was basically mean. <u>It shows some of the tactics that I believe that transpired with me that showed discrimination on my behalf, because she did the same things – tried to do the same things with me as far as ending my career, which I was demoted due to that tactic.</u>

(Exh. 1, Depo. of Plaintiff, pp. 235-237.) (emphasis supplied).

Without regard to the truth of the allegations against Ms. Fleming, the fact that she used the same "tactics" with a Caucasian associate that she used with Plaintiff establishes that her "tactics" were not based on race.

Similarly, although Plaintiff thought that Blevins' discipline was too severe, he does not ascribe a racial reason. Instead he testified that Blevins didn't like him because "I was a strong-minded male who knew my business, but then, too, was detailed enough not to have to bow down to a lot of things that he was trying to put me through." (Exh. 1, Depo. of Plaintiff, p. 46.)

Because he lacks evidence that his managers discriminated against him personally on the basis of his race, Plaintiff resorts to generalized allegations that racial hostility and discrimination were rampant in northwest Arkansas. For example, when asked "<u>What has happened to you</u> that you contend is race discrimination?," Plaintiff testified:

A.      Well, when you are referred to as a nigger, that's race discrimination. When you are not treated as fairly as whites, that's discrimination. The basic pieces that show that you are discriminated against. And when you take into a fact that you've got Civil Rights leaders, people that you admire and look up to basically slandered, and nothing is done to the people that slandered their names, that's discriminatory to me.

Q.    Okay.  Anything else?

A.    It is just the market that I was in was a hostile environment.

(Exh. 1, Depo. of Plaintiff, p. 14).

The alleged racial slur against Plaintiff and the comments about civil rights leaders occurred in connection with the investigation of a complaint of harassment against a store manager at a Neighborhood Market.  The investigation of harassment complaints is one of the duties of a DLPS, working with the store manager's supervisor and the Regional Personal Manager.   Plaintiff testified about the alleged racial names and comments:

> Ron pretty much was known throughout the store to be a racist.  Based on conversations with a couple of associates and an investigation that I ran at the store, was proven then that not only was I referred to as a nigger that didn't know what his job responsibilities were, but that Martin Luther King was revered as a Communist and Jesse Jackson was revered as a million dollar libertarian.  He also referred to several associates in a racist term by referring to them as "those black girls," as opposed to using their God-given names.  So, primarily, right off the top of my head, that shows one example of racism in that market.

(Exh. 1, Depo. of Plaintiff, p. 15.)

Upon completion of his investigation of the above complaint, Plaintiff generated a report in which he recommended discharge of the manager.   Blevins, Plaintiff's Regional Manager at the time, agreed with Plaintiff's recommendation, although the decision was ultimately made to demote the manager.[5]  (Exh. 4, Depo. of Blevins, p. 18; Exh. 1, Depo. of Plaintiff, p. 15.)   Significantly, Plaintiff never reported the racial comment about himself to the other managers involved in the investigation or to Blevins, nor did he include it in his report.  (Exh. 1, Depo. of Plaintiff, p. 219.)  The only alleged

---

[5]  Loss prevention's role is to investigate and make recommendations on discipline.  The ultimate decision is made by the managers of the individual being investigated.  (Exh. 1, Depo. of Plaintiff, p. 81.)

racial epithet made in reference to Plaintiff was not made directly to Plaintiff or even in Plaintiff's presence. (Exh. 1, Depo. of Plaintiff, p. 29.)

Plaintiff considered the entire northwest Arkansas region to be hostile to African-Americans. (Exh. 1, Depo. of Plaintiff, p. 201.)  Plaintiff testified:

> As a Razorback football player, life in northwest Arkansas was great.  But life, as one of the first African-American district managers for Wal-mart in northwest Arkansas was a nightmare more based on people's ignorance.

(Exh. 1, Depo. of Plaintiff, p. 199.)

As evidence that the area to which he was assigned was racist, Plaintiff  testified that militant racist recruiting CD's were distributed by a white supremacist group at a store in Van Buren, Arkansas.  (Exh. 1, Depo. of Plaintiff, pp. 201-204.)   Although Plaintiff was offended when the store manager gave the CDs to him, he agrees that it was his shared responsibility as Loss Prevention Supervisor to investigate these types of issues.  Despite Plaintiff's understandable repulsion to this type of activity, he never reported it to his supervisor until the day that he was demoted.   At this time, his supervisor took immediate action by turning the offending tapes over to Wal-Mart's Legal Department. (Exh. 2, Depo. of Fleming, p. 58.)

The two incidents described by Plaintiff fall woefully short of establishing racial discrimination against him. In both of these incidents Plaintiff heard about or received racially-derogatory information as a part of his job as a loss prevention supervisor.  He did not hear the racial epithet directly or listen to the racist CDs.

As repugnant as these two incidents were, they do not describe a pervasive climate of race discrimination sufficient to establish that race was the reason. Neither incident was related in any way to his demotion nor were any of the decision makers

25

connected to the incidents.   In fact, Plaintiff unequivocally testified that neither of his direct supervisors (J.J. Blevins and Glenda Fleming) or those in his chain of command (Keith Aubele and David Gorman) ever subjected him to racial slurs, comments or innuendos either directly or indirectly.   (Exh. 1, Depo. of Plaintiff, pp. 47, 76, 87, and 94.)

## V.   CONCLUSION

Wal-Mart is entitled to a judgment as a matter of law dismissing Plaintiff's Complaint in its entirety.   Plaintiff was demoted for violating legitimate Wal-Mart policies of which Plaintiff was well aware.   In the business judgment of the decision makers in this case, Plaintiff's history of performance issues, and specifically his conduct over the 4th of July holiday, were severe enough to warrant termination.   In recognition of Plaintiff's potential, however, they chose to give him the option of demotion instead. Through use of the open door policy, Plaintiff was allowed to remain a management employee in another division.   This is not the action of a racially-motivated decision maker.   Plaintiff simply cannot meet his ultimate burden of persuasion that Wal-Mart intentionally discriminated against him and summary judgment is appropriate.

Respectfully submitted,

CROSS, GUNTER, WITHERSPOON
& GALCHUS, P.C.
500 President Clinton Avenue, Suite 200
P. O. Box 3178
Little Rock, AR  72203
TEL: (501) 371-9999
FAX: (501) 371-0035

By: _____
Scotty Shively (AR Bar No. 80144)

**ATTORNEYS FOR DEFENDANT,
WAL-MART STORES, INC.**

**CERTIFICATE OF SERVICE**

I, Scotty Shively, do hereby declare that a true and correct copy of the foregoing pleading was served via U. S. mail, postage prepaid, this 14th day of March, 2003.

Mr. Rickey Hicks
Attorney at Law
1100 North University, Suite 240
Little Rock, Arkansas 72207

71328

Scotty Shively